UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NICOLE BUSH, as Administrator of the
Estate of Bruce A. Bush, MICHELE L.
CRANE, as Administrator of the Estate
of Douglas K. Crane, and CONNIE
DRAKE, Individually as Surviving Spouse
and as Administrator of the Goods, Chattels
and Credits of Glenard W. Drake, Jr.,

    Plaintiffs,

   -v-            6:12-CV-1444

CITY OF UTICA, NEW YORK, and
RUSSELL BROOKS, Chief of City of Utica
Fire Department, in his Official and Individual
Capacity,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:         OF COUNSEL:

DREYER, BOYAJIAN LAW FIRM   DONALD W. BOYAJIAN, ESQ.
Attorneys for Plaintiffs       JOHN J. DOWD, ESQ.
75 Columbia Street        BENJAMIN W. HILL, ESQ.
Albany, NY 12210

CITY OF UTICA CORPORATION COUNSEL ZACHARY C. OREN, ESQ.
Attorneys for Defendants
1 Kennedy Plaza, 2nd Floor
Utica, NY 13502

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

**I. INTRODUCTION**

In the early morning hours of September 20, 2009, a fire broke out inside an apartment complex on James Street in Utica, New York. Although the City's Fire Department responded to emergency calls for help, four of the building's tenants—Bruce Bush, Douglas Crane, Glenard Drake, Jr., and Terry Singh—ultimately perished in the smoke and flames.

Thereafter, Nicole Bush, Michele Crane, Connie Drake, and Sharon Marie Hamilton, purportedly acting in their respective capacities as administrators of the decedent's estates, filed this lawsuit against the City of Utica (the "City"), the City's Fire Department ("UFD"), and UFD Chief Russell Brooks ("Chief Brooks"). The complaint, brought pursuant to 42 U.S.C. § 1983 and related state law, alleged principally that UFD personnel violated the Fourteenth Amendment's Equal Protection Clause by purposely and maliciously withholding protective services from decedents because they lived in a low-income neighborhood. In lieu of filing an answer, defendants moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(b) seeking the complete dismissal of plaintiffs' various claims.

On June 4, 2013, a Memorandum–Decision & Order (the "June 4 MDO") issued granting the bulk of defendants' motion, leaving the Equal Protection claims asserted by Bush, Crane, and Drake (collectively "plaintiffs") as the only substantive claims remaining against the City and Chief Brooks (collectively "defendants"). Bush v. City of Utica, 948 F. Supp. 2d 246, 260 (N.D.N.Y. 2013). Defendants immediately appealed, arguing Chief Brooks was entitled to qualified immunity from plaintiffs' remaining causes of action.

On March 17, 2014, the Court of Appeals issued a summary order rejecting defendants' argument, affirming the June 4 MDO's finding that qualified immunity did not,

and would not, attach to the particular allegations underlying plaintiffs' Equal Protection claims. Bush v. City of Utica, N.Y., 558 F. App'x 131, 135 (2d Cir. 2014) (summary order). And although the panel declined to conclude that the differential treatment of "persons of low socio-economic status" gave rise to an elevated form of scrutiny, it nevertheless observed that a policy "of withholding protective services from the decedents because they lived in a low-income neighborhood," if such a policy did in fact exist, would lack the requisite rational relation to a legitimate governmental purpose. Id. at 134.

The remaining parties have since completed discovery and defendants have now moved pursuant to Rule 56 seeking summary judgment on plaintiffs' remaining claims. The motion was fully briefed and oral argument was heard on April 29, 2016 in Utica, New York. Decision was reserved.

## II. **BACKGROUND**[1]

The events at issue in this case occurred at 102 James Street in Utica, New York, the site of a three-story, twelve-unit apartment complex situated in an area recognized by the community as a troubled neighborhood. Klotz Dep. at 16;[2] Dowd Decl. Ex. E at 9 (attaching local newspaper article entitled "Fire Building's Fate Reflects James Street Decline," in which City Councilman James Zecca is quoted as identifying the area as populated by "poor, underprivileged folks"). A number of the building's tenants, including at least one of the decedents, received public assistance with their monthly rent payments. See, e.g., Crane

---

[1] For purposes of this motion, the evidence in the record will be construed in the light most favorable to plaintiffs, the non-movants here, and all reasonable inferences will be drawn in their favor. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[2] Pagination corresponds with CM/ECF.

Dep. at 23 (explaining that a rental assistance program called "Shelter Care Plus" paid half of Douglas Crane's rent).

The apartment building itself was well-known to both the fire marshal and the City's codes department, since it suffered from repeated, and sometimes ongoing, safety violations. See, e.g., Klotz Dep. at 44-83 (discussing letters to building owner regarding laundry list of deficiencies over a period of years leading up to the fire); Brooks Dep. at 96 (noting building's owner was on UFD's "radar" as a repeatedly non-compliant landlord); Beck Dep. at 138 (discussing fire marshal's knowledge of ongoing compliance problems at the building).

Importantly, the building's layout was divided into distinct "front" and "rear" areas, which rendered the apartments located in the "rear" of the building inaccessible from the common areas that could be reached through the building's front entrance. See, e.g., Klotz Dep. at 30. Because of this layout, an entryway and stairwell located near the back of the building was the primary means of accessing the six apartments located in the "rear" area. See id. All four of the decedents occupied apartments accessible from this rear entryway and stairwell—Crane lived on the first floor; Singh on the second floor; and Drake and Bush on the third floor. Oren Aff. Ex. 2 at 18.

On September 20, 2009, at about 1:37 a.m., City dispatch received a telephone call reporting a fire at the building, which would later be determined to have started in the kitchen of Crane's first-floor rear apartment. Pls.' Resp. to Defs.' Statement of Material Facts ¶ 6 ("Pls.' Resp."); Beck Dep. at 92. Patrolman Berger and Officer Petrie, two members of the City's Police Department, were the first to arrive at the scene, where they observed smoke and fire emanating from the rear of the structure. Pls.' Resp. ¶¶ 8-10.

Because dispatch had advised them that a number of occupants were still inside, the officers entered through the front door, "began knocking on apartment doors, including apartment doors on the third floor," and managed to assist several individuals in exiting via the front of the building.  Berger Aff. ¶¶ 9-10, 12-13.  The officers then worked to secure the scene as UFD personnel began to arrive.  Id. ¶ 17.

"Approximately two to three minutes" after the initial dispatch call went out, Deputy Chief John Kelly ("Deputy Kelly") arrived on scene and assumed command.  Kelly Dep. at 25, 29.  According to Deputy Kelly, dispatch had notified him while en route that there was at least one occupant trapped on the second floor.  Id. at 27.  Upon arrival, Deputy Kelly directed UFD personnel to deploy equipment toward the front of the structure.  Pls.' Resp. ¶¶ 19-23.

The parties' respective narratives diverge sharply from here.  According to defendants, it took UFD personnel about eight to ten minutes after Deputy Kelly's arrival to determine that the rear of the structure was inaccessible from the front entrance and to locate the rear entrance to the building.  Pls.' Resp. ¶¶ 27-32.  Even then, they made "very little progress due to the fire" in the approximately twelve to fifteen minutes that had elapsed.[3]  Id. ¶ 31.  Defendants claim that all four decedents had already been overcome by the inferno at this point.  Pls.' Resp. ¶ 32.[4]

---

[3] UFD Lieutenant Scott Wojnas ("Wojnas") asserts that he arrived on scene within seven to eight minutes but was initially unable to enter the rear door.  Wojnas Dep. at 16, 29, 38-39 (characterizing rear entrance as a "death trap").

[4] In support of this claim, defendant's retained expert opines that "all three of the Plaintiffs were in all probability already unconscious, if not deceased, when the initial Utica Fire Department personnel arrived at the scene of the fire."  Terzian Aff. ¶ 3.  Likewise, decedent's death certificates each indicate that the "approximate" time of death was 1:30 a.m.  See Oren Aff. Exs. 22-24.

- 5 -

Nevertheless, defendants assert that UFD personnel repositioned fire fighting equipment and again searched the entire front area of the building before making a number of additional attempts to enter the rear of the building. Pls.' Resp. ¶¶ 33-51, 55-59, 70, 75. These renewed attempts were foiled by, among other things, the fact that the sprinkler system in the rear hallway was not operating at that time. Id. ¶ 76. Eventually, UFD personnel managed to briefly enter the rear of the structure before being almost immediately ordered to withdraw. Id. ¶¶ 82-84; Wojnas Dep. at 46-49. That order came from UFD Chief Andrew Esposito, who had assumed command of the scene and chosen to evacuate UFD personnel from the building in favor of a "defensive fire suppression operation." Pl.'s Resp. ¶ 31.

According to plaintiffs, however, the situation in the rear of the building was far from hopeless, especially when Deputy Kelly and other UFD fire fighters first arrived on scene. For instance, Scott Margarum ("Margarum"), one of the building's tenants who had already escaped safely, re-entered the rear stairwell of the building and made it "all the way up to the second floor" before being stopped and forcibly removed by Fire Fighter Gerald Foster ("Foster").[5] Margarum Dep. at 19-24, 95.

Margarum claims that he experienced "no smoke [and] no fire" while climbing the rear stairwell and that he had no trouble breathing during this time. Margarum Dep. at 20, 23, 55. Further, Margarum claims to have remained on the scene after his removal from the building, where he observed that no more UFD personnel even attempted to enter the building's rear entrance; rather, the fire fighters appeared to be in "slow motion" and "seemed

---

[5] Defendants have submitted a reply affidavit from Foster, who claims he never even entered the building. Foster Aff. ¶ 4.

like they didn't care." Id. at 24-25, 34.

In fact, shortly after being removed from the building's rear stairwell and making these observations, Margarum spotted a supervisor, believed to be Chief Brooks, and rushed over to inquire whether the UFD "were going to go up and try to see if anybody - - they could save anybody upstairs." Margarum Dep. at 31. According to Margarum, Chief Brooks replied that "[w]e're not going to risk the lives or equipment of any fire fighters for anybody on James Street." Id.

Timothy Klotz ("Klotz"), the building's owner, recounts a similar series of events. According to Klotz, he "pushed" his way through some UFD personnel who were "just standing around" and managed to enter the rear stairwell of the building before being dragged back out by two fire fighters. Klotz Dep. at 102-04. Klotz further asserts that he experienced "no flames or smoke in that hallway, absolutely nothing" in the brief period of time before he was removed. Id. at 104.

Like Margarum, Klotz claims that he never observed any more fire fighters attempt to enter the rear of the building. Klotz Dep. at 110. And like Margarum, Klotz claims to have eventually confronted Chief Brooks to ask "[w]hy aren't you sending any firemen in there? I know there's people up there." Id. at 114. Klotz asserts that Chief Brooks's only response was to state that "[t]his building is going to burn because your sprinkler system's not working." Id.[6]

According to plaintiffs, the fire fighting techniques implemented by UFD personnel at the scene—focusing on the front of the building and moving from "unburnt to burnt"—were in

---

[6] Klotz asserts the sprinkler system was working at that point in time. Klotz Dep. at 107-08.

- 7 -

fact disfavored by certain UFD personnel, such as Captain Ralph Lucia ("Captain Lucia") when occupants were known to still be trapped in the building. See Lucia Dep. at 60-61; see also Dowd Decl. Ex. G at 1-37 (UFD incident records describing search and rescue operations during other fires in the City). And despite the approximated times of death reflected on the death certificates, radio logs between 9-1-1 dispatch and an occupant trapped on the second floor of the building continued until approximately 1:44 a.m. See Dowd Decl. Ex. D.

Finally, plaintiffs point out that although New York State "rules and regulations" require the UFD to "submit a minimum of 100 hours of in service training per calendar year for all line firefighters," plaintiffs highlight that UFD personnel, including Deputy Kelly and Chief Brooks, failed to log the requisite training hours, including certain hours devoted to search and rescue techniques, between 2005 and 2009.[7] See Noon Aff. & Ex. C.

## III. LEGAL STANDARDS

### A. Summary Judgment

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson, 477 U.S. at 247.

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit

---

[7] Defendants assert in their reply memorandum that the requirements are different for Chief Brooks and Deputy Kelly, but the record itself does not explain how a "line" firefighter is defined, or how these training requirements may differ according to rank.

under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n. 4. The failure to meet this burden warrants denial of the motion. Id. However, in the event this initial burden is met, the opposing party must then show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. In sum, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. 42 U.S.C. § 1983

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). Accordingly, to prevail on a § 1983 claim, a plaintiff must show (1) the deprivation of

a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law. See 42 U.S.C. § 1983.

### C. Equal Protection

Generally speaking, "there is no constitutional entitlement to protective services from the government." Bush, 948 F. Supp. 2d at 258 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195-96 (1989)). But "[t]he State may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." Id. (citing DeShaney, 489 U.S. at 197 n. 3).

"To state such a claim, a plaintiff must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the 'treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Bush, 558 F. App'x at 134 (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Further, "a plaintiff must establish that 'discriminatory intent was a motivating factor' for defendants' conduct." Bush, 948 F. Supp. 2d at 258 (citing Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 438 (2d Cir. 2009)). "This requirement of discriminatory animus—that discrimination be *intentional*—'implies more than intent as volition or intent as awareness of consequences' of an action or inaction upon the disfavored person." Grenier v. Stratton, 44 F. Supp. 3d 197, 204 (D. Conn. 2014) (quoting Hayden v. Paterson, 594 F.3d 150, 163 (2d Cir. 2010)). "Rather, it requires that a defendant's action or inaction was 'at least in part because of, not merely in spite of, its adverse effects' upon the disfavored person by reason of illegitimate consideration of that person's [class]." Id.

### D. Supervisory Liability

"It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Odom v. Matteo, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." Odom, 772 F. Supp. 2d at 403 (quoting Colon, 58 F.3d at 873); see also Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) (noting that the continued vitality of all five Colon factors set forth above remains an open question post-Iqbal).

### E. Municipal Liability[8]

"Before a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" Carmichael v. City of New York, 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658,

---

[8] "Because an official capacity claim against an official is tantamount to a claim against a governmental entity, when a complaint asserts a 42 U.S.C. § 1983 claim against both a municipal entity and a municipal official in his official capacity, the official capacity claim should be dismissed as duplicative or redundant." Odom, 772 F. Supp. 2d at 392. Accordingly, the official-capacity claim against Chief Brooks will be dismissed as duplicative of the remaining claim against the City.

690-91 (1978)); see also Cash v. Cnty. of Erie, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" and "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'" Cown v. City of Mt. Vernon, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)). Therefore, this element "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'" Roe, 542 F.3d at 36 (citation omitted). Importantly, however, a "municipal policy may be pronounced or tacit and reflected in either action or inaction." Cash, 654 F.3d at 334.

Accordingly, a plaintiff may satisfy this fifth element with evidence of: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Cown, 95 F. Supp. 3d at 637 (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

## IV. **DISCUSSION**

Plaintiffs' remaining § 1983 claims assert that defendants violated the Equal Protection Clause of the Fourteenth Amendment by implementing a policy of employing more conservative fire fighting and rescue techniques—the so-called "don't go in" policy—for fires that took place at low-income, multi-family properties than those ordinarily employed at fires in other areas of the City. Pls.' Mem. at 29. Alternatively, plaintiffs assert the City deliberately failed to train or supervise members of the UFD, including Chief Brooks, with respect to the fire fighting and rescue techniques necessary in the context of fires that occur at multi-family dwellings. Id. at 29-30.

Defendants argue they are entitled to summary judgment on these claims by attempting to set forth in exhaustive detail the specific actions taken by each of the UFD fire fighting personnel present at the scene of the building fire. Defs.' Mem. at 9-19. According to defendants, these "[a]ctions speak louder than words." Id. at 19.

But neither defendants' timeline of events nor defendants' proffered aphorism is sufficient to dispose of plaintiffs' lawsuit, since it does not necessarily matter that decedents may have received *some* fire services. Rather, the crux of plaintiffs' remaining claims is that decedents would have received better, more responsive, or more aggressive protective services if they had not lived in a low-income area on James Street. Elliot-Park v. Manglona, 592 F.3d 1003, 1007 (9th Cir. 2010) (Kozinski, C.J.) ("[D]iminished [protective] services, like the seat at the back of the bus, don't satisfy the government's obligation to provide services on a non-discriminatory basis.").

Equally important, defendants' detailed chronology betrays the existence of numerous factual disputes in the record, since it is only one of the competing factual narratives present

in this case. In fact, a careful comparison of the parties' submissions reveals an entirely unclear, and at times seriously conflicting, record of events that must be resolved by the fact finder tasked with determining the truth of plaintiffs' overarching allegation regarding the existence of the "don't go in" policy. See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (Cardamone, J.) ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."). Accordingly, whatever difficulties may lie ahead for plaintiffs in light of the governing legal standards set forth above, defendants' own submissions presently serve to illustrate why summary judgment in this matter must be denied.

For instance, in response to Margarum's testimony that the UFD did not attempt to enter the rear of the building or that UFD personnel were "slow and did not seem to care," defendants argue "there is no time stamp in the firefight" for when these observations were made. Defs.' Reply Mem. at 5-6. Thus, according to defendants, "the UFD *may* have been slow because they were tired" after going to "a defensive strategy" during the many hours in which they continued to fight the fire. Id. at 6 (emphasis added). Likewise, with respect to Klotz's assertion that he also failed to observe any attempt to enter the rear of the building, defendants suggest UFD personnel may have simply made their attempt at a time when Klotz was not there to witness it. Id.

These may ultimately prove to be persuasive explanations, especially considering that Margarum and Klotz's observations were made during what, by both parties' accounts, appears to have been a chaotic fire fighting operation. But these explanations have no value at this stage of the case, since they require the resolution of disputed factual issues or the

drawing of inferences in favor of the *movants*, something that is of course forbidden to a court considering a motion for summary judgment. See Gallo, 22 F.3d at 1224 (emphasizing that trial court's "duty, in short, is confined at [the summary judgment stage] to issue-finding; it does not extend to issue-resolution").

The same is true of defendants' assertions regarding the time of decedent's deaths. Defendants point to evidence suggesting decedents experienced "quick deaths," noting that the 9-1-1 call involves only one occupant who may have been alive for a brief period beyond the 1:30 a.m. mark. But putting aside the question of how quickly the victim of a fire progresses from unconscious to deceased, neither defendants' arguments, nor defendants' expert, nor even the estimated times of death recorded on decedent's death certificates, can be dispositive of that factual dispute at this juncture.

Rather, viewing Margarum and Klotz's testimony in the light most favorable to plaintiffs, the non-movants here, a reasonable fact finder could conclude that these eyewitness observations, including the testimony that the stairwell in the rear of the building bore no obvious signs of danger, track a timeline which corresponds to the first few minutes of when UFD personnel initially arrived. Likewise, the 9-1-1 call made by a second-floor occupant, who may have faced increasing danger as the fire made its way upward from where it originated on the first floor, provides a basis on which to conclude one or more of the decedents on the second or third floors remained alive for some period of time extending beyond 1:44 a.m.

Further, a fact finder could also conclude that Chief Brooks's statement that he would not "risk the lives or equipment of any fire fighters for anybody on James Street" actually reflected UFD's alleged "don't go in" policy of providing only diminished protective services to

the City's low-income neighborhoods.[9]  And in light of that statement and the fire incident logs detailing search and rescue operations conducted during building fires elsewhere in the City, that same fact finder might also conclude that this policy was inapplicable to fires *not* located on James Street.  Cf. Tapalian v. Tusino, 377 F.3d 1, 7 (1st Cir. 2004) (noting in context of motion for judgment as a matter of law that "[i]t is not necessary that the [ ] evidence *compel* a jury finding of selective treatment, but simply that it *permit* such a rational inference").

Even beyond Margarum and Klotz's testimony about the rear stairwell or Chief Brooks's alleged statement to Margarum, the record reflects several statements by Captain Lucia that, viewed in the light most favorable to plaintiffs, indicate that the fire fighting and rescue techniques ordinarily employed by UFD personnel when occupants are trapped inside a building were different than the orders Captain Lucia received from his supervisors during the first few minutes he arrived on scene to combat the fire at issue.  See Lucia Dep. at 46-47 (answering in the affirmative when asked whether there was "something that [Deputy Kelly] told you that was contrary to what you [saw]?").

In sum, viewing the evidence in the record in the light most favorable to plaintiffs, one could conclude that UFD decision-makers, primarily Chief Brooks, made a conscious choice to endorse or sanction an unwritten policy of employing more conservative fire fighting and rescue operations in low-income areas like James Street than those employed elsewhere, that this policy was motivated in some measure by discriminatory animus, and that this policy resulted in the failure of UFD personnel to rescue one or more of the decedents.  Segal v.

---

[9] Chief Brooks also testified that UFD personnel often possessed "early" access to information about buildings, such as if a history of code and inspection violations existed, that might have informed the actions or omissions of UFD personnel.  Brooks Dep. at 88.

City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("Monell . . . *extends* liability to a municipal organization where . . . the policies or customs that it has sanctioned[ ] led to an independent constitutional violation.").

Notably, the Second Circuit left open the possibility that qualified immunity might yet shield Chief Brooks from individual liability when rejecting defendants' appeal at the pleadings stage. Bush, 558 F. App'x at 134 ("Like the district court, we express no view as to whether qualified immunity may be appropriate after the record is more fully developed.").

But now that the record has been more fully developed in discovery, the disputed facts, viewed in the light most favorable to plaintiffs, make it even more clear that Chief Brooks would not be entitled to qualified immunity as a matter of law. See, e.g., Felix-Torres v. Graham, 687 F. Supp. 2d 38, 55 (N.D.N.Y. 2009) (Suddaby, J.) ("[S]upervisors may be found liable if they created or allowed the policy or custom under which the incident occurred."). Indeed, as the Second Circuit previously stated, a policy "of withholding protective services from the decedents because they lived in a low-income neighborhood," if such a policy did in fact exist, would clearly lack the requisite rational relation to a legitimate governmental purpose. Bush, 558 F. App'x at 134.

Finally, the disputed facts set forth above, the identified deficiencies in yearly rescue training, and the lack of an explanation in the record as to why the stated training requirements differ for, or do not apply to, supervisory personnel such as Chief Brooks or Deputy Kelly, considered together along with the alleged adherence by UFD personnel to the "don't go in policy" for fires at low-income properties, preclude summary judgment on plaintiffs' failure to train theory as well. See Amnesty Am., 361 F.3d 113 at 129-30. Accordingly, defendants' motion will be denied.

## V. **CONCLUSION**

This case brings to mind difficult questions about the degree of deference owed to fire officials making difficult decisions under dangerous conditions. But the numerous factual disputes in the record mean that the question of whether those decisions were motivated by impermissible discriminatory animus or, for that matter, even resulted in diminished protective services, cannot be resolved at this juncture. See Manglona, 592 F.3d at 1007-8.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is DENIED; and

2. The official-capacity claim against Chief Brooks is DISMISSED as duplicative of the claim against the City.

IT IS SO ORDERED.

_____
United States District Judge

Dated: May 31, 2016
      Utica, New York.